Jacqueline Y. **FOUNTAIN,**
et al., **Appellants,**

v.

Sharon Pratt **KELLY, Appellee.**

No. 91–CV–1462.

District of Columbia Court of Appeals.

Argued June 1, 1993.

Decided Aug. 23, 1993.

---

Stephen J. Harburg, with whom John H. Beisner, Thomas J. Karr, Ian G. Hinds, and Robert J. Hayes, Washington, DC, were on the brief, for appellants.

James C. McKay, Jr., Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, DC, were on the brief, for appellee.

Before STEADMAN and SCHWELB, Associate Judges, and PRYOR, Senior Judge.

SCHWELB, Associate Judge:

Appellants, who include homeless residents of the District of Columbia as well as the National Coalition for the Homeless, appeal from a trial court order dated November 15, 1991. In that order, the trial judge vacated, on the basis of the District of Columbia Council's clarifying amendment of local law, a previously entered preliminary injunction in which the judge had required the Mayor and other officials of the District of Columbia, among other things, to cease housing homeless families with minor children in shelters and to provide them with apartment style units. Appellants contend that they continue to be entitled to the preliminary injunction pursuant to federal law. We affirm.

## I.

On February 12, 1990, appellants brought this action for declaratory and injunctive relief. They alleged that they and other homeless persons similarly situated were being "warehoused" in overcrowded hotel shelters, that they were often without cooking facilities, refrigerators, or separate sleeping quarters for adults and children, and that in some instances these conditions continued for periods of several years, to the severe detriment of their children's physical and mental well-being as well as their own. Appellants claimed that the District officials' conduct denied them rights protected by the District's Emergency Shelter Services for Families Reform Amendment Act (the Emergency Shelter Act), D.C.Code § 3–206.3 (1988), by the federal Social Security Act, 42 U.S.C. § 601 et seq., by federal civil rights legislation, 42 U.S.C. § 1983, and by the Due Process Clause of the Fifth Amendment.

On October 12, 1990, in a meticulously documented 73–page Memorandum Opinion and Order in which he detailed the circumstances in which many of our fellow-citizens live,[1] the trial judge issued a prelimi-

---

1. The judge's 48th and 49th findings of fact convey the kinds of conditions which were brought to his attention:

nary injunction requiring the District officials, among other things, to establish apartment-style shelter housing units for homeless families. He ordered that these units be equipped with

> (1) separate cooking facilities and other basic necessities to enable each family to prepare and consume meals; (2) bathroom facilities for the exclusive use of each family; (3) separate sleeping quarters for adults and children; and (4) access to immediate outdoor areas equipped with basic facilities for exercise and play for use by minor children residing in the emergency shelter family housing units.

The judge further ordered the District officials to cease housing homeless families with minor children in hotel, motel or other similar shelters and to place them in facilities which satisfied the foregoing standards.

The judge's decision was based, in substantial part, on the provisions of the Emergency Shelter Act.[2] That Act provides, among other things, that "[b]eginning no later than 1 year from March 11, 1988, the Mayor shall establish and maintain ... a sufficient number of emergency shelter family housing units for homeless families with minor children." D.C.Code § 3–206.3(b)(1) (1991). Each such emergency shelter family housing unit is required to be "in substantial compliance with all rules, regulations and orders codified at Title 14 of the District of Columbia Municipal Regulations," (the Housing Regulations). *Id.*, § 3–206.3(b)(2). Moreover, "[b]eginning 1 year from March 11, 1988, the Mayor shall not place a homeless family with minor children in a hotel, motel, or other similar shelter unless ... unforeseen circumstances leave no acceptable alternative." *Id.* § 3–206.3(c). The judge concluded that he had the authority to order mandatory injunctive relief because, in light of the consistent use in the Act of the word "shall," "the plaintiffs have stated a claim that they have a property interest in the family shelter units ... [contemplated by the Act]."[3]

While the litigation was pending, however, the Council of the District of Columbia adopted emergency and permanent legislation which effectively destroyed any basis in local law for the preliminary injunction issued by the trial judge. On May 10, 1990, the Council's Committee on Human Services issued a Report to accompany Bill 8–156, the District of Columbia Emergency Overnight Shelter Amendment Act of 1990 (the 1990 Act). In its Report, the Committee noted the pendency of legal actions arising under the Emergency Shelter Act and the earlier Overnight Shelter Act of 1984. *See, generally, Atchison v. District of Columbia,* 585 A.2d 150 (D.C.1991). The Committee expressed particular concern with regard to contempt proceedings in *Atchison,* a case in which the District had been required to deposit $1,663,500

---

> 48. Jesus Cruz, his wife and their 5 children, ages 7, 5, 4, 2, and 1, have resided in a single room at the Budget Motor Inn since December 25, 1989. The room has 2 double beds and one rollaway bed. The room does not have a crib or any cooking facilities. The bathroom above Mr. Cruz leaks, as does his sink. The sheets and carpets are filthy, creating a problem for the baby to play on the floor. Also, there are roaches in the room.
> 49. The children of Mr. Cruz become restless, are prone to cry easily and have no place to play. His 7 year old daughter described the situation as "being 'tied up in a cage.'"

**2.** The judge also concluded that by accepting federal financial assistance under the Social Security Act, and by submitting a plan providing that emergency shelter would be provided to homeless families with children, the District may have become obliged to comply with the Emergency Shelter Act as a matter of federal law.

**3.** This court has repeatedly held that, in the absence of unusual circumstances, the word "shall" is mandatory. *See, e.g., District of Columbia v. Riggs Nat'l Bank,* 581 A.2d 1229, 1257 (D.C.1990). Moreover as a matter of syntax, the Act's provision that the Mayor *shall not,* in the absence of unforeseen circumstances, place a homeless family with minor children in a hotel or comparable shelter, would have been difficult for the judge to reconcile, at the time that he issued the preliminary injunction, with the District's contention that no rights or entitlements were being created and that the statute was purely aspirational. If a person "shall not" be placed somewhere, then surely he is "entitled" not to be placed there; to suggest the contrary is to engage in a play on words.

into the registry of the Superior Court. The Committee concluded that "the District has been subject to several court decrees and orders wherein the Courts have embellished the requirements of [the Overnight Shelter Act]," and that in the absence of new legislation "inclusive of a legislative history reflecting legislative intent, the courts will continue to embellish and to expand [the Overnight Shelter Act] as well as [the Emergency Shelter Act]."

To remedy these concerns, the 1990 legislation explicitly provided that "nothing in this act shall be construed to create an entitlement in any homeless person or family to overnight shelter." D.C.Code § 3–206.9(a) (1991). The Committee was emphatic about its purpose:

> The intent of this provision ... is to state clearly the legislative intent that no person or family has any entitlement to the provision of emergency overnight shelter or support services by the District government. Any other construction or interpretation of the provisions of this section shall be violative of the legislative intent of the Council of the District of Columbia.

Moreover, in Resolution 8–234, which accompanied the 1990 Act and declared the existence of an emergency generated by the perceived judicial expansion of existing shelter legislation, the Council focused on the present litigation and its potential cost to the taxpayers.[4]

On August 14, 1990, the District of Columbia Board of Elections and Ethics notified the President of the Senate and the Speaker of the House of Representatives that the Board had received a petition in support of the "Referendum to Reject the D.C. Emergency Overnight Shelter Amendment Act of 1990." In conformity with D.C.Code § 1–1320 (1991), the Board requested Congress not to undertake further review of the 1990 Act until after the referendum election. On November 6, 1990 the proposal that the 1990 Act be rejected was defeated by the polls. See Atchison, supra, 585 A.2d at 153 n. 4. The Act was then resubmitted to Congress, and became law on March 6, 1991.

Faced with these developments, which had decisively changed the legal landscape in existence at the time of his initial ruling, the trial judge granted a motion by the District officials, filed pursuant to Super.Ct.Civ.R. 60(b), to vacate the preliminary injunction. Relying on Winters v. Ridley, supra note 4, 596 A.2d at 577–79 (Schwelb, J., concurring), the judge concluded that the Council's explication in the 1990 Act and accompanying resolution of the meaning of the earlier shelter legislation established that the plaintiffs never had any "entitlement" under the local legislation to the services which he had initially ordered. The judge held that

> [f]or the [c]ourt to continue to require compliance with the language of the Family Shelter Act, which was the basis of the injunctive order, would be to ignore the fact that the [c]ourt no longer has power to require ... continuing enforcement of rights the statute no longer gives. System Federation No. 91 v. Wright, 364 U.S. 642, 652 [81 S.Ct. 368, 373, 5 L.Ed.2d 349] (1961).

---

**4.** After discussing the *Atchison* case, Resolution 8–234 stated, in pertinent part, as follows:

> (4) On February 12, 1990, the case of *Fountain v. Barry* ..., was filed in the Superior Court of the District of Columbia, alleging an entitlement of homeless families to apartment-style housing, among other things, pursuant to the Emergency Shelter for Families Reform Amendment Act of 1987, (citations omitted).
>
> (5) A decision in the *Fountain v. Barry* case is imminent, and this pending decision necessitates clarification of the intent of the Council....

> (7) It is anticipated that the District will spend $40 million to provide emergency shelter and support services to homeless persons and families in Fiscal Year 1990, including in excess of $2 million in court fines. To date, amounts spent to provide emergency shelter and pay court fines have already exceeded the budget of $23 million that was originally approved by the Council and the Congress.

For a discussion of problems posed by legislative actions and declarations intended to affect pending litigation, see Winters v. Ridley, 596 A.2d 569, 580 (D.C.1991) (per curiam) (Ferren, J. concurring); cf. id. at 577 (Schwelb, J., concurring).

The plaintiffs also contended that, notwithstanding the Council's actions in 1990, they continued to be entitled, under the federal Social Security Act, to the preliminary injunctive relief which the trial judge had previously granted. The judge rejected this contention:

> In its October 12 Order, the Court found that the District's "State Plan" under the Emergency Assistance Program of Title IV—A was accomplished by the Family Shelter Act. This, in turn, meant that the defendants were required to comply with the Family Shelter Act or be in violation of the Social Security Act. (Order at 30–31). In this regard the Court concludes that it erred in its October 12 Order.
>
> The District's "State Plan" provides that the District will provide "emergency shelter and meals." (Defendants' Motion to Dismiss, Exhibit A, Attachment 3–A, p. 1). Nowhere in the materials provided to the Court is it clear that the Family Shelter Act was intended to supplant the more generalized language of the "State Plan" or otherwise be deemed tantamount to the "State Plan." Plaintiffs have not pointed to anything in the Social Security Act or its regulations which require mandatory compliance with an independent statute, such as the Family Shelter Act.

## II.

## LEGAL DISCUSSION

### A. The Standard of Review.

The present appeal is from the trial judge's order of November 20, 1991 dissolving his previously entered preliminary injunction. *See*, D.C.Code § 11–721(a)(2)(A) (1989), authorizing an appeal from an "interlocutory order ... granting, continuing ... or dissolving [an] injunction," *Hercules & Co. v. Shama Restaurant Corp.*, 566 A.2d 31, 35 (D.C.1989). No final order has been entered, and the action remains alive. The question before us, therefore, is whether the trial judge erred in vacating his prior order, and thereby ultimately denying appellants a preliminary injunction.

"The decision [whether] to grant or deny preliminary injunctive relief is committed to the sound discretion of the trial court." *Stamenich v. Markovic*, 462 A.2d 452, 456 (D.C.1983). At this stage of the case, we are not required to resolve the merits of the dispute between the litigants. *Don't Tear it Down, Inc. v. District of Columbia*, 395 A.2d 388, 390 (D.C.1978); *Stamenich, supra*, 462 A.2d at 457. We have stated that

> [a] proper exercise of discretion requires the trial court to consider whether the moving party has clearly demonstrated (1) that there is a substantial likelihood he will prevail on the merits; (2) that he is in danger of suffering irreparable harm during the pendency of the action; (3) that more harm will result to him from the denial of the injunction than will result to the defendant from its grant; and, in appropriate cases, (4) that the public interest will not be disserved by the issuance of the requested order.

*Wieck v. Sterenbuch*, 350 A.2d 384, 387 (D.C.App.1976). "A preliminary injunction is an extraordinary remedy, and the trial court's power to issue it should be exercised only after careful deliberation has persuaded it of the necessity for the relief." *Id.*

 "The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation." *District 50, United Mineworkers of America*, 134 U.S.App.D.C. 34, 37, 412 F.2d 165, 168 (1969).[5] In the present case, 'on the other hand, appellants have asked for mandatory preliminary injunctive relief, which would require significant changes in the situation which existed when the suit was filed. Since they seek to alter the status quo rather than to maintain it, appellants must be held to a substantially higher standard than in the usual case. *Doe v. New York*

---

5. "The status quo is the last uncontested status which preceded the pending controversy." *Id.*

at 37, 412 F.2d at 168.

*University*, 666 F.2d 761, 773 (2d Cir.1981); *National Ass'n of Rehabilitation Facilities, Inc. v. Schweiker*, 550 F.Supp. 357, 365 (D.D.C.1982). Indeed, "[a]n action purportedly requesting a mandatory injunction against a federal official is analyzed as one requesting mandamus." *National Wildlife Federation v. United States*, 200 U.S.App.D.C. 53, 54 n. 1, 626 F.2d 917, 918 n. 1 (1980). Mandamus is an extraordinary remedy. *In re GTE Service Corp.*, 246 U.S.App.D.C. 45, 47, 762 F.2d 1024, 1026 (1985). Accordingly, the trial judge having vacated his mandatory injunction, we should not order him to reinstate it "unless the law and the facts *clearly* support the moving party." *Doe, supra*, 666 F.2d at 773 (emphasis added); *National Ass'n of Rehabilitation Facilities, Inc., supra*, 550 F.Supp. at 365.

■ Appellants have not made such a showing. Assuming, without deciding, that they have established that they would be irreparably injured unless the preliminary injunction is reinstated, and that the balance of equities and the public interest tilt in their favor—a questionable assumption in light of the Council's actions in connection with the 1990 legislation [6]—appellants are unable to clear the first and, in this case, the most important hurdle placed in their path by our conventional four-part test. *See Wieck, supra*, 350 A.2d at 387. Specifically, they cannot demonstrate the existence of a clear probability that they will prevail on the merits. On the contrary, in light of the Supreme Court's decision in *Suter v. Artist M.*, —— U.S. ——, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), appellants' prospects of ultimate victory in this action can fairly be characterized as less than auspicious.

### B. Likelihood of Success on the Merits.

Although, as we have seen, appellants initially based their complaint on the Emergency Shelter Act, the federal Social Security Act, and the Fifth Amendment, they have apparently abandoned the first and third ground for purposes of this appeal, and have relied solely on the Social Security Act (as supplemented by 42 U.S.C. § 1983). We confine our discussion to the issue which appellants are continuing to pursue.

The Social Security Act, 42 U.S.C. § 601 *et seq.*, authorizes the federal government to provide financial assistance to States and to the District for the purpose of furnishing emergency assistance to families with dependent children. Receipt of federal funds is conditioned, however, upon the State's adoption of a plan, which must be approved by the Secretary of Health and Human Services. *See* 45 C.F.R. § 233.120. The plan must provide, among other things, that "it shall be in effect in all political subdivisions of the State and, if administered by them, be mandatory upon them." 42 U.S.C. § 602(a)(1). The Social Security Act does not require the District to provide emergency shelter, but authorizes the federal government to share the cost in the event that the District adopts a satisfactory plan to provide such services.

It is undisputed that the District has in fact submitted a state plan pursuant to the Social Security Act, and is receiving federal financial assistance. Since our capital city contains no political subdivisions, the plan is mandatory as to the entire District. The District's plan states, without further elaboration, that "emergency shelter and meals" will be provided to homeless families with children. Appellants contend that the District is required to comply with its plan, that appellants are entitled to preliminary and permanent injunctive relief compelling the District to do so, and that in spite of the Council's actions in 1990, the Emergency Shelter Act continues to define the District's minimal obligations pursuant to its plan. Accordingly, say appellants, this court should require the trial judge to reinstate his preliminary injunction.

---

**6.** The Council's determination that recognition of an enforceable entitlement to the kinds of accommodations and services required by the preliminary injunction would require expenditures substantially beyond the District government's means has, at least arguably, significantly altered the calculus which existed when the trial judge found in appellants' favor on the equities and issued a mandatory injunction.

■ Appellants do not claim, nor can they, that the Social Security Act explicitly authorizes private citizens to institute suits to enforce its provisions. The burden is on appellants to demonstrate that, in spite of the absence of any such authorization, Congress intended to imply a private right of action. *Suter, supra,* —— U.S. at ——, 112 S.Ct. at 1370; *see Cort v. Ash,* 422 U.S. 66, 80–85, 95 S.Ct. 2080, 2089–91, 45 L.Ed.2d 26 (1975). "When Congress intends private litigants to have a cause of action to support their statutory rights, the far better course is for it to specify as much when it creates those rights." *Cannon v. University of Chicago,* 441 U.S. 677, 717, 99 S.Ct. 1946, 1968, 60 L.Ed.2d 560 (1979).[7] Moreover, "it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy, a court must be chary of reading others into it." *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979).

In the present context, there is an obvious and undisputed prime remedy; if the District fails to carry out its plan to the Secretary's satisfaction, federal financial assistance can be discontinued or curtailed. Appellants have cited nothing in the Social Security Act or in its legislative history which would suggest that Congress intended to create a private civil remedy as well. Accordingly, we conclude that the present action cannot be maintained under the Social Security Act, standing alone. *See Suter, supra,* —— U.S. at ——, 112 S.Ct. at 1370.

Appellants contend, however, that the Social Security Act must be considered in conjunction with 42 U.S.C. § 1983. Section 1983 provides, in pertinent part, that "[e]very person who, under color of any statute ... of any state ... or the District of Columbia, ... subjects any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." In *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Supreme Court held that § 1983 may be invoked as a remedy for violations not only of the Constitution, but also of federal statutory law. Section 1983, in other words, provides standing to persons claiming deprivation of federal statutory rights, at least in some situations, even where no right of action is created by the underlying federal statute pursuant to which the claim is being made.

The Supreme Court has, however, recognized certain restrictions on the doctrine announced in *Thiboutot.* Section 1983 is not available to redress federal statutory violations

> where Congress has foreclosed such enforcement of the statute in the enactment itself and *where the statute did not create enforceable rights, privileges or immunities within the meaning of § 1983.*

*Suter, supra,* —— U.S. at ——, 112 S.Ct. at 1366 (*quoting Wright v. Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987)) (emphasis added). The principal question presented here is whether appellants have demonstrated a clear probability that they will prevail on the claim that the Social Security Act created rights enforceable through § 1983.

In *Suter,* the Supreme Court confronted an issue quite similar to the one presented here. The federal Adoption Assistance and Child Welfare Act (Adoption Act), 42 U.S.C. §§ 620 *et seq.,* establishes a federal reimbursement program for certain expenses incurred by the States in administering foster care and adoption services. *See Suter, supra,* —— U.S. ——, 112 S.Ct. at 1363. To participate in the program, States must submit a plan to the Secretary of Health and Human Services for approval. *Id.*

---

7. Not only is it "far better" for Congress to so specify when it intends private litigants to have a cause of action, but for this very reason this Court in the future should be extremely reluctant to imply a cause of action absent such specificity on the part of the Legislative Branch.
 *Id.* at 718, 99 S.Ct. at 1968–69 (Rehnquist, J., concurring).

The State plan required by the Adoption Act must provide that "the plan shall in effect in all political subdivisions of the state, and, if administered by them, shall be mandatory upon them." 42 U.S.C. § 671(a)(3). Moreover, the Adoption Act requires the plan to provide that reasonable efforts will be made to prevent removal of children from their homes and to facilitate reunification of families where removal has occurred.

The plaintiffs in *Suter* were a class of parents whose children were in the care of the defendants, officials of the State of Illinois. Like appellants in this case, they sought declaratory and injunctive relief, alleging that the defendants had failed to carry out their obligations pursuant to the State plan. They claimed that the Adoption Act provided them, by implication, with the right to institute the action, and that in any event the suit was authorized by 42 U.S.C. § 1983. The United States District Court issued a preliminary injunction. *Artist M. v. Johnson*, 726 F.Supp. 690 (N.D.Ill. 1989). A divided United States Court of Appeals affirmed. *Artist M. v. Johnson*, 917 F.2d 980 (7th Cir.1990).

The Supreme Court reversed. The Court noted that if the Secretary finds that the State's plan, as administered, does not comply with the Act, then he has the authority to reduce or eliminate payments to that State. *Suter, supra,* — U.S. at —, 112 S.Ct. at 1368. The Court further observed that neither the statute nor the regulations imposed any obligation upon recipients of federal funds other than the requirement that the State submit a plan to be approved by the Secretary. *Id.* — U.S. at —, 112 S.Ct. at 1369. The Court continued:

> What is significant is that the regulations are not specific, and do not provide notice to the States that failure to do anything other than submit a plan with the requisite features, to be approved by the Secretary, is a further condition on the receipt of funds from the Federal Government.

*Id.* Finally, the Court concluded that

> the 'reasonable efforts' language does not unambiguously confer an enforceable right upon the Act's beneficiaries. The term 'reasonable efforts' in this context is at least as plausibly read to impose only a rather generalized duty on the State, to be enforced not by private individuals, but by the Secretary in the manner previously discussed.

*Id.* — U.S. at —, 112 S.Ct. at 1370.

Here, as in *Suter*, the Secretary can terminate or restrict federal financial assistance to a non-complying recipient. Here, as in *Suter*, the statute and regulations require simply that the State file a plan. Each statute contains a provision effectively making the plan mandatory. In one respect, *Suter* is stronger for the plaintiffs than the present case; the Adoption Act, as noted above, has a "reasonable efforts" requirement, while the Social Security Act does not even contain that. Appellants have offered no persuasive basis for distinguishing *Suter*,[8] and we know of none. Given the convincing showing of probability of success on the merits which a party must make in order to show that the judge abused his discretion in declining to keep in effect a mandatory preliminary injunction, we conclude that *Suter* mandates affirmance.[9]

**8.** In their Reply Brief, appellants contend that the standard to be enforced under the Social Security Act is "more concrete" than the "reasonable efforts" requirement in the Adoption Act. The State's only obligation under the Social Security Act, however, is to submit a satisfactory plan, and *Suter* establishes that this is insufficient to create a private right of action. We have considered other proposed distinctions tendered by appellants, but also we are satisfied that none would have affected the result in *Suter*.

**9.** Appellants rely heavily on several pre-*Suter* decisions of the Supreme Court, including *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) and *Wright v. Roanoke Redevelopment and Housing Authority, supra.* They quote *Wright*, for example, for the proposition that the Supreme Court does "not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy." 479 U.S. at 423–24, 107 S.Ct. at 770. In a forceful dissenting opinion in *Suter*, Justice Blackmun, writing for himself and Justice Stevens, argued that the majority decision was inconsistent with *Wright* and *Wilder.* — U.S. at — – —, 112

## III.

For the foregoing reasons,[10] the order appealed from is hereby

*Affirmed.*[11]

S.Ct. at 1370–71. Indeed, the dissenters in *Suter* were in the majority in *Wright* and *Wilder,* whereas all of the justices in the *Suter* majority who were members of the Court at the time of *Wright* and *Wilder,* except Justice White, dissented from those decisions.

Appellants' arguments on this appeal are similar to those made by the dissenters in *Suter* (and by the Court of Appeals in its opinion in that case). *Wright* and *Wilder* were 5:4 decisions; *Suter* was decided by seven votes to two. The last of the three decisions might be viewed as contrary, at least in emphasis, from the two earlier ones. In fact, one court has remarked that *Suter* "calls into question the continued viability of the framework set forth in *Wilder.*" *Resident Council of Allen Parkway Village v. United States Dep't of Hous. & Urban Dev.,* 980 F.2d 1043, 1051 (5th Cir.1993); *Cf. Stowell v. Ives,* 976 F.2d 65, 68 (1st Cir.1992) ("the old regime [of *Wilder* ] fell on hard times" when the Supreme Court's *Suter* decision "shed new light on this fuliginous area of the law.") It is not for this court, however, to question the Supreme Court's adherence to its own precedents; we hold only that the prospects of distinguishing *Suter* are too bleak to entitle appellants to reversal here.

**10.** Even if appellants were able to persuade us that they will probably prevail on the question whether the Social Security Act and 42 U.S.C. § 1983 provide them with a right of action, we share the trial judge's reservations about the notion that, by submitting a plan which makes no mention of the Emergency Shelter Act, the District committed itself to compliance with the

standards contained in that Act. *Cf. Suter, supra,* —— U.S. at ——, 112 S.Ct. at 1366, *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981). This is especially true since the Council has since declared that those standards were not designed to be binding, and that they were apparently aspirational only.

We note the observation by the New York Court of Appeals that "in a civilized society, a shelter which does not meet minimal standards of cleanliness, warmth, space and rudimentary conveniences is no shelter at all." *McCain v. Koch,* 70 N.Y.2d 109, 119–20, 517 N.Y.S.2d 918, 923, 511 N.E.2d 62, 66 (1987) (quoting the trial court opinion, *McCain v. Koch,* 127 Misc.2d 23, 23, 484 N.Y.S.2d 985, 987 (Supreme Ct.N.Y.Co. 1984)). In light of our holding that appellants are not entitled to a preliminary injunction, however, we need not now identify "minimal standards" such as those to which the court alluded in *McCain.*

**11.** It has been reported in the press that the District has recently withdrawn from the emergency assistance program for homeless families, and that a motion to dismiss as moot a federal action apparently raising issues similar to those in this case has been filed by the District and opposed by the plaintiffs. However, neither party has moved before us to dismiss this appeal as moot, and we are not prepared to do so *sua sponte. See In re Melton,* 597 A.2d 892, 908 n. 32 (D.C.1991) (en banc); *Honig v. Doe,* 484 U.S. 305, 332, 108 S.Ct. 592, 608, 98 L.Ed.2d 686 (1988) (Rehnquist, C.J., concurring).