Aubrey POWELL, A Minor, By and
Through His Mother, Shirley
RICKS, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 92–CV–423.

District of Columbia Court of Appeals.

Argued Oct. 1, 1993.
Decided Nov. 29, 1993.

Timothy Junkin, with whom Lauren Clingan, Washington, DC, was on the brief, for appellant.

Edward E. Schwab, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Deputy Corp. Counsel, Washington, DC, were on the brief, for appellee.

Before ROGERS, Chief Judge, and SCHWELB and KING, Associate Judges.

SCHWELB, Associate Judge:

Aubrey Powell, a minor, appeals from the Superior Court's dismissal of his complaint for failure to state a claim upon which relief can be granted. Through his mother and next friend, Shirley Ricks, Aubrey filed a three-count complaint against the District of Columbia, alleging that injuries which he sustained in a traffic accident were proximately caused by the District's common law negligence and by its negligence in failing to comply with certain federal and local statutes. The complaint also alleged that the District denied Aubrey liberty and property interests protected by the Fifth Amendment. The essence of all three counts is that by placing Aubrey in a homeless shelter at a busy intersection, six miles from his elementary school, and by failing to provide him with transportation to and from school, the District was legally responsible for injuries which Aubrey suffered when he was struck by an automobile while he was crossing the street on his way home from school. We affirm the judgment below.

# I.

## THE FACTS

The complaint alleges that prior to September 1990, Aubrey and his younger brother Jacques had been living with their mother in an apartment in the Anacostia section of the District. Both brothers attended the Friendship School, a public school located across the street from their residence. In March 1990, Ms. Ricks lost her job as a nursing assistant. Six months later, Ms. Ricks had exhausted her savings and had fallen several months behind in her rent.

On September 17, 1990, according to the complaint, the family was evicted from the Anacostia apartment. After sleeping for two days in the hallway outside their former unit, Ms. Ricks and her sons obtained emergency shelter through the District's Department of Human Services (DHS). The agency placed the family in the Budget Motor Inn, which is located at 1615 New York Avenue, N.E., six miles from their former home in Anacostia. Aubrey, then aged thirteen, and Jacques, then aged nine, continued to attend the Friendship School.[1]

The complaint alleges that Aubrey and Jacques had to cross Bladensburg Road at New York Avenue each day in order to take public transportation to and from Friendship School. It is alleged that the intersection which they were required to cross was a heavily travelled and very dangerous one, and that the District had frequently been apprised of the danger and had promised to provide a school bus. On December 4, 1990, according to Aubrey's counsel, the boys were returning home from school when Jacques suddenly darted out into Bladensburg Road, about fifteen feet from the intersection. Aubrey raced into the street in order to save his brother, and was struck by an oncoming automobile.[2] Aubrey

---

1. The complaint alleges that DHS representatives never asked Ms. Ricks which school the boys attended, and that they made no effort to determine whether the family could be placed in any of the five shelters in Ward 8, in the vicinity of the boys' school. It is further alleged that the District made no effort to have the boys transferred to a school closer to the Budget Motor Inn. No claim is made, however, that Ms. Ricks requested that the boys be transferred; indeed, it appears that they were doing well at the Friendship School.

2. The facts regarding the precise location of the accident and Jacques' role in it were not described in Aubrey's complaint. Because counsel conceded these facts at oral argument before this court, we may consider them in our resolution of the issues presented. *See Maryland Life &*

sustained contusions, lacerations, and a fractured left femur. His injuries required surgery, and he was placed in a body cast. No claim is made that the driver, who is not a party to this suit, failed to exercise due care.

Ms. Ricks filed a timely complaint on Aubrey's behalf against the District in the Superior Court. The District filed a motion to dismiss the complaint or, in the alternative, for summary judgment. The trial court dismissed the action on the District's motion, without written elaboration and without any oral statement of reasons. This appeal followed.

## II.

### LEGAL DISCUSSION

■■■■ A complaint may be dismissed for failure to state a claim only when it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Vicki Bagley Realty, Inc. v. Laufer*, 482 A.2d 359, 364 (D.C.1984); Super.Ct.Civ.R. 12(b)(6). In reviewing the dismissal, we accept as true the facts alleged in the complaint and construe them in the light most favorable to the plaintiff. *Wanzer v. District of Columbia*, 580 A.2d 127, 129 (D.C. 1990); *Laufer*, 482 A.2d at 364. The legal sufficiency of the complaint is a question of law, and our review of the trial court's decision is therefore *de novo*. *Vaughn v. United States*, 579 A.2d 170, 172 (D.C.1990).

A fair reading of the complaint discloses that relief is sought under three separate, although somewhat interconnected theories, namely (1) common law negligence, (2) negligence based on alleged statutory violations, and (3) denial of federally protected constitutional and statutory rights. We address each of these theories in turn.

### A. Common Law Negligence.

■■■■ The elements of a common law action for negligence are (1) a duty of care owed by the defendant to the plaintiff, (2) a breach of that duty by the defendant, and (3)

damage to the plaintiff, proximately caused by the breach of duty. *District of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C.1984); W. PAGE KEETON, PROSSER AND KEETON ON TORTS, § 30, at 164–65 (5th ed. 1984). The District has no legal obligation to avoid *all* risks of injury which may result from its acts or omissions; rather, it is required only to act with reasonable caution and to avoid those risks that can reasonably be foreseen. *Cf. Munson v. Otis*, 396 A.2d 994, 996 (D.C.1979) (per curiam). The District contends that the complaint was properly dismissed, because the District had no legal duty to protect Aubrey while he was crossing the street, *see Cooper, supra*, 483 A.2d at 321–22, and because the connection between any breach of duty and the accident was too attenuated to permit an impartial trier of fact to find proximate cause, *cf. District of Columbia v. Sterling*, 578 A.2d 1163, 1166 (D.C.1990). We agree.

Aubrey was a pedestrian who was struck by a car while crossing the street. It is not alleged that the District owned the vehicle that struck Aubrey, or that any representative of the District was driving it or had any other direct connection with the accident. The sole basis presented by Aubrey for holding the District liable is that the District failed to prevent the accident from happening. Stated another way, Aubrey claims that the District had a legal duty to protect him from the accident and that his injuries were proximately caused by the breach of that duty.

■■■■ The District has no generalized obligation to protect citizens from traffic accidents. *See, e.g., Stoddard v. District of Columbia*, 623 A.2d 1152, 1152–53 (D.C.1993). Ordinarily, the District's only duties vis-a-vis pedestrians are to maintain walkways and crosswalks which are reasonably safe for pedestrian traffic, and to maintain traffic signals and signs, so that vehicular traffic is controlled and pedestrians know where they can walk safely. *McKethean v. WMATA*, 588 A.2d 708, 715–16 (D.C.1991); *District of Columbia v. Pace*, 498 A.2d 226, 229, 230–31 (D.C.1985); *Wagshal v. District of Columbia*,

*Health Ins. Guar. Ass'n v. Perrott*, 301 Md. 78,     482 A.2d 9, 13 (1984).

216 A.2d 172, 173–74 (D.C.1966). The complaint does not allege a violation of any of these duties.

■ The complaint does allege that the homeless shelter was located near an especially hazardous intersection and that the District was on notice of this condition, both from representatives of the homeless and as a result of articles in the media. Taking these allegations, as we must, to be true, it does not follow that the District became a guarantor of the safety of every pedestrian who attempted to cross the street in the vicinity of this intersection. *See, e.g., Forsman v. District of Columbia*, 580 A.2d 1314, 1316–17 (D.C.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 173, 116 L.Ed.2d 136 (1991). In order to recover against the District, Aubrey must "allege and prove that the District owed [him] a special duty . . ., greater than or different from any duty which it owed to the general public." *Id.* (quoting *Klahr v. District of Columbia*, 576 A.2d 718, 719 (D.C. 1990)).

■ Aubrey's situation is said to be different from that of a member of the general public because, according to his counsel, "the District of Columbia took Aubrey Powell, a helpless child, into its custody and assumed the responsibility for meeting his most basic need, housing." Indeed, Aubrey's submission continues, "the District simultaneously placed the plaintiff in a helpless state and required him to overcome that helplessness in order to attend school as required by D.C. law." *See* D.C.Code § 31–402 (1993) (compulsory school attendance). We are unable to agree that the District's provision of rent-free housing to a homeless family (which counsel for plaintiff infelicitously characterize as a restraint on personal liberty comparable to incarceration or institutionalization) placed the District *in loco parentis* or required it to supplant Ms. Ricks and to supervise Aubrey's activities in crossing the street. Indeed, Aubrey continued to live with his moth-er, and a homeless parent who resides with her children in a shelter does not thereby surrender to the government her right and responsibility to raise and supervise them.

■ The complaint alleges that, following, *inter alia*, a May 1989 accident in which a six-year-old boy was struck by a truck as he crossed New York Avenue, the Superintendent of Schools

promis[ed] on October 16, 1990, that school bus transportation would be provided to homeless schoolchildren at the Budget Inn by November 6, 1990. This did not occur. If it had, Aubrey Powell would not have been injured on his way from school to the shelter on December 4, 1990.

This promise was allegedly made to legal representatives of the residents of the Budget Inn collectively, rather than to Aubrey as an individual. Assuming, without deciding, that a promise to such a group of persons would be sufficient to extract the case from the strictures of *Forsman, Klahr*, and other "public duty" decisions, it was insufficient as a matter of law to impose liability on the District here. Proximate cause is "that cause which, in natural and continual sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred." *McKethean, supra*, 588 A.2d at 716 (quoting *S.S. Kresge Co. v. Kenney*, 66 App.D.C. 274, 275, 86 F.2d 651, 652 (1936)). An intervening negligent act breaks the chain of causation if it is not foreseeable. *Id.* at 716; *see also Lacy v. District of Columbia*, 424 A.2d 317, 323 (D.C.1980). Here, according to counsel, Jacques darted into a busy street at some distance from the intersection, *cf. Stoddard, supra*, 623 A.2d at 1152, and Aubrey was struck by a car while attempting to save the younger boy. Assuming that the District's alleged failure to carry out its promise was a "but for" cause of the accident, it was not a proximate cause.[3] *Cf. District of Columbia v. Freeman*, 477 A.2d 713, 716–17 (D.C.1984).

**3.** It is claimed on Aubrey's behalf that, but for the District's alleged promise, the attorneys for the residents of the shelter would have instituted litigation to compel the District to provide a school bus. Many District schoolchildren travel to and from school by public transportation, see text at page 10, *infra*, and we need not decide under what, if any, circumstances estoppel will lie against the District. *Cf. Office of Personnel Management v. Richmond*, 496 U.S. 414, 423–24, 110 S.Ct. 2465, 2470–71, 110 L.Ed.2d 387 (1990); *Rafferty v. District of Columbia Zoning*

Aubrey's attorneys also argue that the District has an obligation to exercise reasonable care to prevent foreseeable harm to students attending public schools. It relies, *inter alia,* on *District of Columbia v. Royal,* 465 A.2d 367, 369 (D.C.1983) and *District of Columbia v. Doe,* 524 A.2d 30, 33–34 (D.C.1987). These cases, however, involved events originating or occurring on school grounds.[4] While there are some decisions which have imposed liability even where students were injured off campus, the relationship between the injury and the plaintiff's school activities was not as attenuated in any of them[5] as it was in this case.[6]

We conclude that the special circumstances here alleged, including the fact of Aubrey's residence in a shelter located near a dangerous intersection, the Superintendent's promise to provide a school bus, and Aubrey's status as a student, were insufficient to defeat a motion to dismiss for failure to state a claim upon which relief can be granted. None of these factors, individually or in combination, would permit an impartial jury to impose liability on the District for common law negligence.

### B. Negligence Based on Alleged Statutory Violations.

Aubrey also contends that the District failed to carry out its duties to him pursuant to two statutes which govern the rights of homeless families with children, that these statutory violations proximately caused his injuries, and that the complaint therefore states a claim under these statutes upon which relief may be granted. We conclude, as a matter of law, that there is no sufficient nexus between any noncompliance by the District with these enactments and the injury of which Aubrey complains.

■ The first of the statutes on which Aubrey relies is the Crawford Act, D.C.Code § 3–206.3(g) (1988). That Act provides in pertinent part that the Mayor shall not place a homeless family with minor children in a hotel or motel for more than fifteen days in the absence of unforeseen circumstances which leave no acceptable alternative. The Council of the District of Columbia has more recently declared that this legislation was never intended to create any legal entitlement to overnight shelter or support services. *See* D.C.Code § 3–206.9(a) (1991); *Fountain v. Kelly,* 630 A.2d 684, 686–87 (D.C.1993). Even if the Crawford Act had created enforceable rights, rather than aspirational goals, it would be of little help to Aubrey. By its terms, the Act was designed to provide homeless families with suitable units containing cooking and other facilities,

---

*Comm'n,* 583 A.2d 169, 175 (D.C.1990). We conclude as a matter of law that any connection between the District's failure to honor this promise and Aubrey's injuries is far too speculative to enable an impartial trier of fact to find proximate cause. This is especially true since the promise was allegedly made on October 16, 1990, only a few weeks before the accident, and since no such suit was filed between November 16, 1990 (the date that bus service was allegedly to begin) and December 4, 1990 (the date of Aubrey's injury).

4. In *Royal,* the plaintiff was accidentally struck by a pole which fell from a newly uncovered fence; in *Doe,* the plaintiff, an elementary school student, was abducted from a classroom by an intruder and subsequently raped.

5. *See, e.g., Duval County School Bd. v. Dutko,* 483 So.2d 492, 495 (Fla.App. 1 Dist.), *appeal denied,* 492 So.2d 1331 (Fla.1986) (School Board held liable for death of student struck by automobile, where Board failed to warn students and parents of known traffic perils of Board-designated school bus stop or to take precautionary measures).

6. In *Toeller v. Mutual Serv. Casualty Ins. Co.,* 115 Wis.2d 631, 340 N.W.2d 923 (App.1983), the case that comes closest to supporting Aubrey's position, a school bus driver told an eleven-year-old boy who had misbehaved that he could not ride the school bus. The driver did not advise the boy's parents that their son would not be allowed on the bus. The boy likewise failed to tell his parents, and set off for school on his bicycle. He was struck by a motorist, and the driver was held liable for his injuries.

*Toeller* differs from the present case in that the bus driver's allegedly wrongful conduct was more closely associated than was the District's alleged conduct in the present case with the school's relationship with the student. Moreover, the bus driver's failure to notify the boy's parents that their son would not be allowed to ride the bus precluded the parents from making alternate arrangements. In the present case, on the other hand, Aubrey's mother knew that no school bus was available.

instead of with hotel rooms. *Id.* at 686. Its purpose was wholly unrelated to ensuring pedestrian safety. Indeed, the District would have fully complied with the Act if it had housed Ms. Ricks and her sons in an apartment-type unit on the grounds of the Budget Inn, and such an assignment would not have affected, in any way, the probability of a traffic accident. Nothing in the statute suggests that the District must provide housing for homeless families in remote locations away from busy streets.

■ Counsel for Aubrey also argue that the District breached duties created by the McKinney Act, 42 U.S.C. § 11432(e), which requires the District, as a recipient of federal financial assistance, to consider whether it would be in the best interests of a child who has become homeless to assign that child to a new school. 42 U.S.C. § 11432(e)(3)(A). States which receive federal funds pursuant to the Act are also required to provide school transportation services to homeless children equal to those provided other students. 42 U.S.C. § 11432(e)(5). It is discernable from the face of the statute that Congress enacted these provisions in order to ensure that homeless children, like other children, can attend the most convenient and appropriate schools. The McKinney Act was not intended to promote pedestrian safety, or to ensure that children do not have to cross the street on their way to and from school.

Indeed, students are as likely to have to cross a street near their home in order to attend a neighborhood school as they are when they ride public transportation or a school bus to a school outside the neighborhood. Similarly, even if a school bus is provided, they may well have to cross a street in order to catch that bus. Moreover, many District children use public transportation when they travel to and from school by bus or subway. *See* D.C.Code §§ 44–217 to 44–219 (1990) (providing for subsidized fares for students). Users of public transportation, whether subsidized or not, often must cross the street in order to reach the right bus stop or to complete the journey after their bus ride is over.

■ Assuming, without deciding, that the District violated the Crawford Act, the McKinney Act, or both, we conclude as a matter of law that any breach of statutes so unrelated to pedestrian safety could not be the proximate cause of injuries incurred by Aubrey in a traffic accident. "The lack of a legal link between the District's negligence and these alleged injuries renders them uncompensable." *Cooper, supra,* 483 A.2d at 322. The accident was not a foreseeable consequence of a breach of statutory duty, because the statutes invoked on Aubrey's behalf were not designed to promote pedestrian safety, and because they lacked any rational connection with that worthy but unrelated goal.

### C. *Constitutional Claim.*

The final claim made on Aubrey's behalf, asserted pursuant to 42 U.S.C. § 1983, *see Fountain, supra,* 630 A.2d at 690–92, is that the District deprived him of liberty and property without due process of law by failing to protect him while he was in the District's "custody" and by knowingly exposing him to dangerous conditions and unreasonable risks. In the context of a traffic accident which occurred under the circumstances alleged here, these contentions are altogether unpersuasive.

■ The Due Process Clause "was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'" *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989) (quoting *Davidson v. Cannon,* 474 U.S. 344, 348, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986)). In *DeShaney,* the Court stated that

> nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. *The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.* It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to

ensure that those interests do not come to harm through other means.

*Id.,* 489 U.S. at 195, 109 S.Ct. at 1003 (Emphasis added).

Aubrey relies on a line of Supreme Court decisions which stand for the proposition that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *DeShaney, supra,* 489 U.S. at 198, 109 S.Ct. at 1004. In *Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976), for example, the Court held that the Eighth Amendment requires the government to provide medical care to an incarcerated prisoner, because the prisoner is unable "by reason of deprivation of his liberty [to] care for himself." Similarly, in *Youngberg v. Romeo,* 457 U.S. 307, 315–16, 102 S.Ct. 2452, 2457–58, 73 L.Ed.2d 28 (1982), the Due Process Clause was construed to require the State to provide adequate food, shelter, and medical care for involuntarily committed persons, because their commitment foreclosed other avenues of assistance. As the Court explained in *DeShaney,*

> [t]aken together, [these cases] stand only for the proposition that *when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being....* The rationale for this principle is simple enough: when the state by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. *The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf....* In the substantive due process analysis, it is

the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the deprivation of liberty triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

489 U.S. at 199–200, 109 S.Ct. at 1005–06 (emphasis added; citations, footnotes and internal quotation marks omitted).

The present case does not resemble *Estelle* or *Youngberg.* The District does not restrict the liberty of a homeless family in any significant way when it provides that family free housing. Ms. Ricks nor Aubrey was a ward or prisoner of the District, nor was the family's freedom of action curtailed.

Counsel for Aubrey also contend that the District denied Aubrey constitutionally protected rights by knowingly placing him in a shelter near a dangerous intersection and by failing to take adequate steps, *i.e.,* the provision of school bus service, to protect him from potential injury in a traffic accident. This contention, however, is foreclosed by the Supreme Court's decision in *Collins v. City of Harker Heights,* —— U.S. ——, —— –——, 112 S.Ct. 1061, 1069–70, 117 L.Ed.2d 261 (1992). In *Collins,* the Court held that the Due Process Clause does not require a municipality to provide "minimal levels of safety and security" to its employees. *A fortiori,* no such constitutional obligation exists vis-a-vis citizens, not employed by the District, who avail themselves of free government services. Moreover, the decision to locate a homeless shelter at a particular site is a discretionary governmental function as to which the District enjoys sovereign immunity, *see McKethean, supra,* 588 A.2d at 715 (relocation of bus stop), and the provision of subsidized transit to students satisfies the District's responsibilities in that regard. Finally, we reiterate our conclusion that any alleged connection between the District's acts or omissions and Aubrey's injuries is insufficient, as a matter of law, to constitute proximate cause.[7]

---

7. Essentially for the same reason, *i.e.,* the lack of    a rational nexus, we also conclude that the trial

## III.

### CONCLUSION

For the foregoing reasons, the judgment of the trial court is hereby

*Affirmed.*

court correctly dismissed Aubrey's § 1983 claim, founded on *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) and its progeny, *see also Fountain, supra,* 630 A.2d at 690–91, alleging that the District denied him rights protected by the McKinney Act.